IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

GLENN LEWELLEN

No. 18 CV 6864

Judge Joan B. Gottschall

**GOVERNMENT'S RESPONSE TO
GLENN LEWELLEN'S 28 U.S.C. § 2255 PETITION**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to Glenn Lewellen's petition pursuant to 28 U.S.C. § 2255, as follows. In his motion, Lewellen argues that his trial counsel rendered ineffective assistance during the proceedings against him. Lewellen's motion should be denied for the reasons set forth below.

**District Court Proceedings**

***The Charges***

On January 13, 2011, Glenn Lewellen, among other defendants, was charged in a third superseding indictment with participating in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 1); possessing with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C.

§ 841(a)(1) (Count 4); and conspiring to possess cocaine with intent to distribute and to distribute five or more kilograms of cocaine and one or more kilograms of heroin, in violation of 21 U.S.C. §§ 841 and 846 (Count 13). R. 271 at 1-21, 34-38. [1]   The charges arose from a criminal enterprise run by Lewellen, a Chicago Police Department officer, and drug dealer Saul Rodriguez, wherein the two, along with at least 13 other participants, robbed, kidnapped and murdered drug dealers in order to obtain ransom money and drugs from them.   *United States v. Cardena*, 842 F.3d 959, 971 (7th Cir. 2016), cert. denied, 138 S. Ct. 247, 199 L. Ed. 2d 159 (2017).

### *The Trial*

On November 15, 2011, Lewellen and five of his codefendants proceeded to trial.   *Id.*; R. 676.   Two trial issues are pertinent to this motion.

#### *The unexplained wealth issue*

During the trial, following testimony that Lewellen received a portion of the cash proceeds from the criminal enterprise's sale of cocaine or collection of ransom money, the government introduced evidence of Lewellen's use of cash for personal and professional purposes. For example, in 2006, Lewellen

---

[1] Citations to the record in Lewellen's criminal case, 09 CR 332-2, are to "R.", followed by the applicable docket item number.   Citations to the record in the current matter are to "2255 R.", followed by the applicable docket item number.

purchased four classic cars totaling $175,000, $145,000 of which was paid in cash. *United States v. Cardena*, 842 F.3d 959, 982–83 (7th Cir. 2016). Lewellen also used significant amounts of cash in his construction business, such as to purchase 70 home lots, after which he paid a finder's fee of $60,000 in cash. *Id.* He also used $140,000 in cash, bound with rubber bands, to pay subcontractors.[2] *Id.*

During closing argument, the government argued that Lewellen's use of more than $388,000 in cash to buy cars and pay contractors came from criminal activity, not from his modest salary as a police officer. *Cardena*, 842 F.3d at 982–83. The government only once referred to the evidence as Lewellen's unexplained wealth. *Id.* Lewellen did not object to the testimony about his use of cash or to the government's use of that evidence, including the government's characterization of the financial evidence as unexplained wealth,

---

[2] The government also presented some evidence of Lewellen's other sources of income, such as testimony from a former business associate that Lewellen told him that he had a $1 million workplace-injury settlement while at CPD (Lewellen's personnel records do not mention any settlement); and Lewellen told him that his wife had received a "couple million dollars" from an injury in an accident (no evidence at all was offered to either prove or disprove that payment). *Cardena*, 842 F.3d at 982–83. The government did not present evidence of the legitimate income that Lewellen earned from his contracting business, but did introduce testimony that the business owned a $125,000 Hitachi excavator and that Lewellen provided a $1.2 million down payment to purchase land for a subdivision. *Id.*

though he did argue in closing that there was no "unexplained wealth" because he made all of the money through a legitimate business venture. *Id.*

### *In-court identification issue*

On December 8, 2011, during the trial, defense counsel notified the district court that government agents had brought government witnesses to the courtroom window, prior to their testimony, to see if they could identify defendants. *United States v. Cardena*, 842 F.3d 959, 978–79 (7th Cir. 2016); Tr. 2322-2330. Defense counsel objected to the practice, and the government explained that it had only been used for witnesses who had had long-standing social and business relationships with the defendants. *Id.* The exception was victim Salvador Hernandez, who said he did not recognize anyone in the courtroom. *Id.* The district court directed the government to discontinue the practice, and permitted the defense to cross-examine Hernandez about his inability to identify any Defendant through the courtroom window. *Id.*

On December 11, 2011, the government provided a letter to defense counsel in which it provided further details about witnesses identifying Defendants through the courtroom window. Specifically, the government disclosed that, at the direction of the prosecutors in the case, agents directed witnesses Lisette Venegas, David Venegas, Roy Cockriel, Andres Torres, Maria Saldivar and possibly Eric Herrera to look through the window of the

courtroom prior to their testimony to see if they could identify anyone in the courtroom. R. 903 at 18-19. The witnesses were not instructed to look at any particular person or any specific part of the courtroom. *Id.* The letter further noted that, after looking through the courtroom window, all of these witnesses, with the exception of Herrara, made identifications consistent with their grand jury testimony. *Id.*

Defense counsel did not raise the issue again during the trial.

### The verdict

On January 31, 2012, the jury convicted Lewellen of Count 13 (the narcotics conspiracy), but was unable to come to a unanimous verdict regarding the racketeering conspiracy charged in Count 1. R. 803.

### Post-trial motions

Lewellen moved for a new trial, arguing that evidence of his financial situation was improperly admitted as "unexplained wealth" because the government did not offer evidence of the legitimate income he earned in his homebuilding business. *Cardena*, 842 F.3d at 982–83. The district court found that the financial evidence was improperly admitted under a theory of unexplained wealth but concluded that, because evidence of large cash expenditures was independently admissible, Lewellen was not prejudiced by any improper argument. *Id.*

Lewellen further argued that the courtroom window identifications violated his Fifth Amendment right to due process. *Cardena*, 842 F.3d at 979. The district court, after a hearing, denied the motion, finding that there was no due process violation, since the witnesses were not coerced and did not have an identification suggested to them; the government disclosed to the defense which witnesses were brought to the courtroom door; most of these witnesses were individuals who had long-term social and business relationships with defendants; and the only victim in the group, Hernandez, was unable to make an identification and was cross-examined by defense counsel about the practice. R. 1065 at 3-4. The trial court based its ruling in part on *United States v. Kord*, 836 F.2d 368, 372-73 (7th Cir. 1988) (holding that the government's conduct in taking the witness to the window was inappropriate and unduly suggestive but did not render the identification unconstitutionally unreliable). R. 1065 at 3.

### *Lewellen's Sentencing*

Prior to sentencing, a presentence investigation report was prepared, wherein the probation officer determined that Lewellen's total offense level was 43 and his Criminal History Category was I, corresponding to a range of life imprisonment. R. 915 at 12, 13, 19. The offense level was calculated as follows, based on the November 2011 version of the Sentencing Guidelines:

| | |
|---|---|
| Base offense level, pursuant to Guideline §§ 2D1.1(a)(5) & 2D1.1(c)(2) | 38 |
| Enhancement for the possession of a firearm during the course of the kidnappings of Victims A, B, C, E, FF, GG, and Peter Flores, which occurred within the charged conspiracy, pursuant to Guideline §2D1.1(b)(1) | +2 |
| Enhancement for the use of violence, specifically, the use of a taser on one of the victim drug couriers whom Lewellen and his coconspirators had kidnapped in 2005, pursuant to Guideline § 2D1.1(b)(1) | +2 |
| Enhancement for restraint of a victim, as at least nine individuals were kidnapped, held against their will and restrained during the course of the course of the conspiracy, pursuant to Guideline §3A1.3 | +2 |
| Enhancement for leadership, pursuant to Guideline §3B1.1(a) | +4 |
| Enhancement for the obstruction of justice since in 2006, Lewellen compromised a federal wiretap of co-defendants Saul Rodriguez and Andres Torres, 306 which related directly to the investigation of the Rodriguez DTO which had commenced in 2005, pursuant to Guideline § 3C1.1. | +2 |

This resulted in a subtotal of 52, although the offense level was reduced to 43 pursuant to Guideline §5A, Application Note 2.

Lewellen objected to the guidelines calculations, arguing that the drug quantity alleged was not reasonably foreseeable to him, and no reliable

evidence supported the four enhancements.  R. 1318 at 8.  He attacked the credibility of the witnesses against him and stated that none of the testimony was specific or verifiable enough to be the basis for any sentencing determination, whether evaluated by a preponderance of the evidence or beyond a reasonable doubt.  *Id.* at 18.

The trial court held a sentencing hearing on May 20, 2013.  R. 1396. After hearing argument from the parties, the trial court found that there was insufficient evidence to meet the preponderance standard regarding the two-level enhancement pursuant to Guideline §2D1.1(b)(1) for the use of a taser, or the four-level leadership enhancement pursuant to Guideline §3B1.1(a). R. 1396 at 80, 90.  The trial court thus found that Lewellen's total offense level was 46, which was reduced to 43 pursuant to Guideline §5A, Application Note 2. The trial court sentenced Lewellen to a below-Guidelines term of 216 months' imprisonment.  R. 1344.

**Appellate Court Proceedings**

Lewellen appealed, arguing, as pertinent to this motion, that the district judge erred in holding that the prosecution's improper "unexplained wealth" evidence and argument did not cause any appreciable prejudice.  *United States v. Lewellen*, 2015 WL 882617 (7th Cir. app. brief 2017).  The Seventh Circuit affirmed, finding that the government's introduction and use of

8

evidence of Lewellen's cash expenditures was proper and that any improperly admitted evidence of non-cash expenditures could not have impacted the verdict. *Cardena*, 842 F.3d at 986–87.

Specifically, although the Seventh Circuit found that the government's characterization of Lewellen's wealth after 1999 as "unexplained" was improper, it found that most of the evidence introduced was relevant and admissible as evidence of his involvement in a drug conspiracy, especially in light of the fact that witnesses testified that his use of the cash in the particular circumstances was unusual. *Cardena*, 842 F.3d at 986–87 (citing *United States v. Duran*, 407 F.3d 828, 837 (7th Cir. 2005) (large amounts of cash relevant evidence of drug conspiracy); *United States v. Chavis*, 429 F.3d 662, 669–70 (7th Cir. 2005); *United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles.")). The appellate court further found that any erroneous admission of the non-cash evidence did not prejudice Lewellen since it supported Lewellen's theory that he ran a successful business venture with legitimate, high-value transactions.[3] *Id.*

---

[3] The Seventh Circuit also found the district court did not abuse its discretion in denying Lewellen's motion for severance. *Cardena*, 842 F.3d at 981.

Lewellen also argued that he was entitled to a new trial, since witnesses were brought to the courtroom window for purposes of making identifications prior to testifying, in violation of his Sixth Amendment right to counsel. *Cardena*, 842 F.3d at 978. Reviewing for plain error (since the defendants had failed to make a Sixth Amendment challenge in the district court to the practice), the Seventh Circuit found that the practice subverted "the long-standing tradition that a witness identify the defendant in the courtroom on the witness stand in front of the jury and counsel," but that it did not prejudice the defendants or seriously affect the fairness, integrity or public reputation of judicial proceedings. *Id.* at 979.

**Lewellen's § 2255 Petition**

On October 11, 2018, Lewellen filed a petition pursuant to 18 U.S.C. § 2255, accompanied by a supporting memorandum. 2255R 1, 3. Lewellen contends that his trial counsel was ineffective for:

1. failing to uncover available evidence, and to use evidence in their possession, to defeat the government's arguments concerning Lewellen's unexplained wealth;

2. failing to present crucial evidence at trial because of a conflict of interest;

3. failing to raise a Sixth Amendment challenge to the prosecution's improper out-of-court identification procedures; and

4. failing to present available evidence at sentencing, leading to the imposition of four inapplicable enhancements.

2255R 1 at 14.

Lewellen further argues that his Fifth Amendment due process rights were violated by the prosecution when it presented false evidence at trial and improperly vouched for its case during closing arguments. *Id.*

None of Lewellen's arguments is meritorious.

## ANALYSIS

In order to prevail on a claim of ineffective assistance of counsel, Lewellen must show that (1) his attorney's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different.

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The inquiry under the first component of this test is "highly deferential" to counsel. *Id*. at 689. Counsel is presumed to have made reasonable strategic judgments, and "there is a strong presumption that any decisions by counsel fall within a wide range of reasonable trial strategies." *Valenzuela v. United States*, 261 F.3d 694, 698-99 (7th Cir. 2001) (quoting *United States v. Lindsay*, 157 F.3d 532, 535 (7th Cir. 1998)). Strategic decisions are not second-guessed on review. *United States v. Ruzzano*, 247 F.3d 688, 696 (7th Cir. 2001).

The second component of the *Strickland* test requires the petitioner to establish that he was prejudiced by his counsel's deficient performance. *Strickland*, 466 U.S. at 689. This requires Lewellen to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Lewellen must satisfy both prongs of the test in order to meet his burden, and a finding against Lewellen on either prong ends the inquiry. *Id*. at 697.

"To reflect the wide range of competent legal strategies and to avoid the pitfalls of review in hindsight, [the Court's] review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance." *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014) (citation omitted); see also *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017) (courts apply a " 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (citation omitted). "The central question in this analysis is not whether counsel's conduct 'deviated from best practices or most common custom,' but instead, 'whether an attorney's representation amounted to incompetence under prevailing professional norms.' " *Delatorre*, 847 F.3d at 845 (quoting *Sussman v. Jenkins*, 636 F.3d 329, 349–50 (7th Cir. 2011) ). Trial counsel's "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and trial counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

### 1. Lewellen has not shown that his attorneys performed ineffectively regarding the government's evidence of unexplained wealth.

Lewellen argues that his attorneys were ineffective for failing to investigate, or to use evidence he characterizes as "available" to rebut the government's evidence of "unexplained wealth," contending that it was "an essential part of the government's case. 2255R 1 at 19, 42-46. He claims

that his attorneys could have called accountant Melissa Schwartz and private investigator Robert Kennealy to "provide clarity to the jury regarding Lewellen's financial position" and to "show that the prosecution's trial exhibits painted an incomplete picture" of Lewellen's finances. *Id.* at 44. He contends that his attorneys could also have presented evidence regarding Mrs. Lewellen's personal injury settlement and Lewellen's gambling activities to rebut the government's arguments concerning his cash expenditures. *Id.* His arguments fail for several reasons.

First, even if his attorneys' performance was somehow deficient, Lewellen cannot satisfy the second prong of *Strickland* that requires him to establish prejudice. As mentioned above, that evidence had two parts: (a) Lewellen's possession and use of cash during the conspiracy; and (b) the government's characterization of Lewellen's wealth as "unexplained." The Seventh Circuit held that the cash evidence was properly admitted as relevant evidence of Lewellen's participation in the conspiracy. With respect to the latter, Lewellen's attorneys argued in their post-trial motions that the government's unexplained wealth evidence, and the government's closing argument regarding the evidence, was improper. R. 863. Both the trial court and the Seventh Circuit agreed. R. 1152 at 1 ("[T]he court concludes that the evidence was not properly admitted under the theory of unexplained

wealth, and that the closing arguments on that subject were therefore improper."); *Cardena*, 842 F.3d at 986 ("[T]here was no evidence of the amount of legitimate income Lewellen earned in his homebuilding business . . . [w]ithout that evidence, it is impossible to evaluate whether the money he was spending was inconsistent with the money he was earning . . . the characterization of Lewellen's wealth after 1999 as "unexplained" was improper."). However, the Seventh Circuit held that any erroneous admission of non-cash financial evidence or the government's arguments about that evidence did not prejudice Lewellen and could not have impacted the verdict, since it supported Lewellen's theory that he ran a successful business venture with legitimate, high-value transactions. *Id.* This conclusion mandates the dismissal of Lewellen's arguments on collateral review: the "unexplained wealth" evidence caused Lewellen no prejudice.

Second, there is a presumption that Lewellen's attorneys acted reasonably, and Lewellen has not established otherwise.

With respect to Lewellen's non-cash expenditures, rebutting that evidence as a defense tactic could have seriously backfired on Lewellen, since it might have supplied the very "legitimate income" evidence that the Seventh Circuit found lacking, and could have led to the characterization of this evidence as proper under an "unexplained wealth" theory. Strategic calls

15

such as this are virtually unchallengeable. *Strickland*, 466 U.S. at 690–91. Counsel is presumed to have made reasonable strategic judgments, there is a strong presumption that any decisions by counsel fall within a wide range of reasonable trial strategies, and strategic decisions are not second-guessed on review. *Valenzuela v. United States*, 261 F.3d 694, 698-99 (7th Cir. 2001); *United States v. Lindsay*, 157 F.3d 532, 535 (7th Cir. 1998); *United States v. Ruzzano*, 247 F.3d 688, 696 (7th Cir. 2001).

With respect to the evidence about Lewellen's use of cash, the Seventh Circuit found that the evidence of Lewellen's cash expenditures was admissible as evidence of his participation in the conspiracy. *Cardena, id.* at 986. Even had his attorneys objected or provided additional argument in favor of the objection, the appellate court already has determined that the government's evidence was pertinent, properly admitted, and relevant to establishing Lewellen's participation in the conspiracy.

Lewellen's arguments regarding his attorneys' alleged failure to investigate fare no better. When a petitioner alleges counsel's failure to investigate resulted in ineffective assistance, that petitioner has the burden of providing the Court with specific information as to what the investigation would have produced. *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003). A petitioner must present "a comprehensive showing as to what the

investigation would have produced." *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1133 (7th Cir.1990). At the very least the petitioner must submit an affidavit from the uncalled witness stating the testimony he or she would have given had they been called at trial. *Wright v. Gramley*, 125 F.3d 1038, 1044 (7th Cir.1997)"); *see also Raygoza v. Hulick*, 474 F.3d 958, 961 (7th Cir.2007) (defense counsel's failure to investigate murder defendant's alibi claim was worthy of habeas relief where petitioner had affidavits from seven alibi witnesses). In addition, to meet the requirements of *Strickland*, the missing testimony must be so material that it would have changed the outcome of the trial. Lewellen has not met that burden.

Lewellen attaches an affidavit from Melissa Schwartz, which states that she served as an accountant and tax preparer for Lewellen and his home building business. 2255 R 1 at 66. The affidavit states that she was available to provide information and records to Lewellen's attorneys and to testify at trial, but was not called. *Id.* This affidavit falls far short of the "comprehensive showing" that her testimony would have been admissible, material, and exculpatory, particularly on the relevant issue of cash expenditures. For example, it contains no useful facts or figures about Lewellen's income, much less details about his use, or non-use, of cash or the source of that cash.

The letter from Robert Kennealy similarly fails to show that the defense had any relevant, admissible evidence to offer on the issue of cash expenditures. 2255R 1 at 68-70. The letter discusses certain discrete financial transactions (as was relevant to a proffered government exhibit entitled Source and Application of Funds), but does not discuss Lewellen's cash expenditures—his source of cash during the timeframe of the conspiracy, his use of cash to pay subcontractors, his use of cash to purchase expensive vehicles, or his payment of a finder's fee in cash.

Lewellen's discussion of his wife's personal injury settlement is likewise unhelpful. To be sure, his attorneys did not present any evidence about the settlement or about Ms. Lewellen's gambling winnings. But Lewellen fails to explain how he would have admitted this evidence and how it would have been relevant to the issue of Lewellen's cash expenditures. He includes no affidavit from Ms. Lewellen or any other potential witness that would support his apparent theory that Ms. Lewellen converted the settlement check and all or part of the gambling winnings to cash and then gave the cash to her husband, and does not proffer any evidence that this is the cash that he then used for the expenditures at issue during the trial. In short, Lewellen has failed to do anything more than speculate that this evidence may have been helpful and

therefore has fallen far short of proving that the evidence would have rebutted the government's theory of unexplained cash expenditures.

Lewellen's "evidence" regarding his sporting betting activities with James Entress is similarly deficient.  2255R 1 at 44-45.  Though he claims that Entress' widow, Aggie Entress, could have been called as a witness regarding Entress' gambling ledger and large amounts of cash she found in their home following Entress' death, he fails to attach an affidavit from Ms. Entress or from any other witness that would support his purely speculative comments.  Without a witness to lay a foundation for the ledger and to support his apparent contention that the $400,000 found in Ms. Entress' home somehow was related to the cash the government alleged Lewellen had in his possession and used during the conspiracy, this "evidence" falls far short of the necessary comprehensive showing.

In summary, Lewellen has failed to show that his attorneys performed ineffectively regarding the issues of unexplained wealth or cash transactions, or that their performance regarding these issues affected the verdict.

**2.  Lewellen's counsel were not ineffective regarding his retirement account evidence.**

Lewellen argues that his attorneys operated under a conflict of interest that prevented them from presenting crucial evidence at trial.  2255R 1 at 46-

50. He contends that his attorneys failed to present evidence regarding his retirement account to rebut the prosecution's "unexplained wealth" theory, since use of this evidence would have made the Court aware that they had dissipated the money without the Court's knowledge. Lewellen's attorneys were not ineffective regarding this issue.

As background, on or about May 13, 2011, Lewellen was released on a $1 million bond, secured by four retirement accounts (worth $218,000) and a quitclaim deed. R. 355. Lewellen argues that by November 2011, he liquidated approximately $120,000 from the retirement accounts to pay attorneys fees, which he claims was done without the knowledge or approval of the trial court. 2255R 1 at 47-48. Lewellen contends that, prior to the bond hearing, he told his attorneys that the retirement accounts were funded in part with the proceeds of illegal gambling, and that his attorneys limited their use of financial evidence at trial for fear that it would reveal their acceptance of funds sourced from illegal conduct. *Id.* His argument lacks merit.

The Sixth Amendment right to counsel includes the right to conflict-free counsel. *United States v. Smith*, 771 F.3d 1045, 1047 (7th Cir.2014); *Blake v. United States*, 723 F.3d 870, 880 (7th Cir.2013) (citations omitted); see also *Strickland*, 466 U.S. at 688 ("counsel owes the client a duty of loyalty, a duty

to avoid conflicts of interest"). A conflict of interest arises when the defense attorney is required to make a choice between advancing his own interests and advancing his client's interests. *Daniels v. United States*, 54 F.3d 290, 294 (7th Cir. 1995). In the event of an actual conflict of interest, a defendant must show an adverse effect stemming from the conflict by demonstrating that there is a reasonable likelihood that his counsel's performance would have been different had there been no conflict of interest. *Blake v. United States*, 723 F.3d 870, 880 (7th Cir. 2013). In the absence of an actual conflict, consistent with *Strickland*, a defendant must establish deficient performance and a reasonable probability that but for counsel's unprofessional errors the trial outcome would have been different. *Blake, id.* at 880 (internal citations and quotations omitted).

Lewellen has not shown either a conflict of interest or deficient performance coupled with prejudice from the deficiency. First, as argued above, Lewellen cannot establish prejudice from any ineffective assistance of counsel regarding the evidence of non-cash unexplained wealth. The Seventh Circuit held that, although the theory was improper, the introduction of the evidence and argument was harmless. The same conclusion dictates that additional efforts by defense counsel to defeat the theory would have had no impact on the verdict.

Second, Lewellen has failed to show that any conflict existed here. His argument rests on the premise that, had his attorneys introduced records or testimony regarding the retirement accounts used to secure his bond, the trial court would have found a reason to inquire into the current status of the retirement accounts. This is speculative at best.

As an initial matter, the retirement spending occurred long after the expenditures at issue at trial. Lewellen's bond was posted in May 2011. The trial started in late 2011. The spending at issue at trial was more than a decade earlier, during a conspiracy that spanned from 1996 to 2009. There is little reason to believe that Lewellen's spending of retirement funds after he was indicted would have been relevant to a defense argument regarding his use of cash funds during the conspiracy.

In addition, the retirement funds would not have been useful evidence to rebut the government's theory regarding Lewellen's unexplained cash. At trial, the government introduced evidence that Lewellen possessed and used approximately $388,000 in cash used to buy cars and pay contractors in suspicious transactions. *Cardena*, 842 F.3d at 982. According to Lewellen, his attorneys should have rebutted the government's evidence by introducing evidence of his payment of up to $218,000 into his retirement accounts, using illegal gambling funds, but this lacks logic. His funding of his retirement

accounts does not disprove that he *also* made $388,000 worth of cash payments. In fact, if anything, the illegal gambling would have run the risk of casting Lewellen in an even more unfavorable light in the eyes of the jury.

Moreover, even if it weren't a risky tactic, Lewellen has failed to show that he had the evidence and witnesses necessary to make the argument. He proffers no details as to when and what extent the retirement accounts were funded with illegal gambling proceeds. He does not explain how, even if he could show that a portion of the accounts were funded with illegal gambling proceeds at some point relevant to the charged conspiracy, this would rebut the government's evidence that he engaged in suspicious and excessive cash transactions that supported their evidence of narcotics trafficking.

### 3.    A Sixth Amendment challenge to the "courtroom window" identification procedure would not have changed the outcome of the trial.

Lewellen argues that his trial attorneys were ineffective for failing to raise a timely Sixth Amendment challenge to the "courtroom window" identification procedure that occurred during trial. 2255R 1 at 50-53. He contends that a contemporaneous Sixth Amendment challenge would have allowed him to cross examine the witnesses more thoroughly and aggressively about their identifications. His argument lacks merit.

First, Lewellen's argument is premised on the theory that he was entitled to have counsel present in the hallway at the time that the witnesses viewed him through the window. 2255R 1 at 51. Not so. In the context of a post-indictment police lineup, a defendant is entitled to counsel. *United States v. Wade*, 388 U.S. 218 (1967). This is because a lineup can offer "opportunities for prosecuting authorities to take advantage of the accused" and counsel might be "better able to reconstruct the events [of the lineup] at trial" without "giving up [defendant's] privilege against compulsory self-incrimination." *United States v. Ash*, 413 U.S. 300, 312-13 (1973). By contrast, these concerns play no role where a witness identifies a defendant from outside of the courtroom. *United States v. Montgomery*, 150 F.3d 983, 993-95 (9th Cir. 1998). Just as a defendant is not entitled to be present with counsel when a witness is shown a photograph of them, *Ash*, 413 U.S. at 312-13, defendants have no right to counsel where they are observed from outside of the courtroom by a witness without their knowledge.

The Ninth Circuit considered and rejected a Sixth Amendment challenge in a case with similar facts. In *Montgomery*, 150 F.3d at 993-95, a witness was shown photographs of the defendant prior to trial, and on the day before he was scheduled to testify, he went into the courtroom with a DEA agent, at his own request, to view the defendant to be certain that the defendant was

the individual who had sold him the illegal red sulfur at issue in the criminal case. *Id.* On appeal, the defendant challenged the identification, arguing that the combination of identification procedures—the initial photo-identification, the subsequent single photograph identification, and the one-on-one confrontation—was "unnecessarily suggestive and conducive to irreparable mistaken identification." *Id.* The Ninth Circuit rejected his challenge, finding that he "confused the adversarial confrontation that occurs when a defendant is compelled to participate in a police lineup or show up with the surreptitious observation of the defendant in the courtroom by an identification witness … prior to his testimony." *Id.* at 993-95.[4] A defendant in the latter scenario is not "confronted by a prosecutor with superior knowledge of the law," is not "threatened with a loss of an available defense because he did not have the guiding hand of counsel," and is "not faced with the choice of giving up his privilege against compulsory self-incrimination in order to

---

[4] As the Seventh Circuit noted in the appeal of this case, there appears to be a circuit split on the question of whether permitting a witness to identify the defendant in the courtroom prior to testifying violates the Sixth Amendment. *Compare United States v. Roth*, 430 F.2d 1137, 1140–41 (2d Cir. 1970) (extending *Wade* to courtroom walk-through of witness) and *Cannon v. Alabama*, 558 F.2d 1211, 1217 (5th Cir. 1977) (applying *Wade* where officer asked witness to look through courtroom window), with *United States v. Montgomery*, 150 F.3d 983, 994–95 (9th Cir. 1998) (not extending Wade to identification through courtroom window because it was a "non-adversarial" identification not requiring assistance of counsel). *United States v. Cardena*, 842 F.3d 959, 979 (7th Cir. 2016). Since it found that any error in the practice was harmless, the Seventh Circuit declined to weigh in on the issue. *Id.*

present evidence of the unnecessarily suggestive nature of this identification procedure"; therefore, the concerns identified in *Wade* are not present. *Id.* at 995.

Second, as the Seventh Circuit held on direct appeal in this case, the government's use of courtroom-window identifications was harmless. The appellate court concluded that, although not a preferred practice, it did not prejudice the defendants or seriously affect the fairness, integrity or public reputation of judicial proceedings. This same conclusion holds true here: Even had the defense attorneys performed ineffectively for not pursuing a Sixth Amendment challenge to the practice, Lewellen cannot establish that he was harmed by the ineffectiveness.

Lewellen attempts to use portions of civil depositions, taken of co-conspirators Lisette and David Venegas in a civil matter years after the trial, in an effort to discredit their trial identifications and to claim that they had been coached. 2255R1 at 31-33. He attaches brief excerpts of the deposition transcripts that make it extremely difficult to evaluate the context in which the questions were asked. Without more, these transcripts are entitled to minimal weight in determining the validity of identifications made years earlier. In any event, the Venegases were not identification witnesses. They are not like the eyewitness about whom *Wade* is concerned. They were

participants in the crime with Lewellen; there is no doubt that they could affirmatively identify Lewellen as a co-conspirator based on their long-term relationship with him and other members of the criminal enterprise.

Lewellen argues that his attorneys could have cross examined the witnesses more vigorously on their identifications if a contemporaneous Sixth Amendment challenge had been made.   2255R 1 at 52.   Again, this would not have changed the outcome of the trial.   As noted above, Lewellen did cross examine one witness regarding this practice.   Had he done so with the other witnesses who identified him through the window, the prosecution would no doubt have rehabilitated the witnesses with the fact that they had long-term relationships with Lewellen and had identified him in photographs well in advance of trial.

### 4.  Lewellen's claims of sentencing error may not be revisited in a § 2255 motion.

Lewellen argues that his trial counsel was ineffective at sentencing for failing to adequately contest the imposition of four sentencing enhancements. 2255R 1 at 53-57.   He claims that his trial attorney could have more vigorously attacked the credibility of the witnesses underlying the trial court's sentencing decisions.   His arguments are without merit.

First, Lewellen did not appeal his sentence and therefore is precluded from raising this challenge on collateral review. A collateral attack pursuant to § 2255 is not a substitute for a direct appeal. *Varela v. United States*, 481 F.3d 932, 935 (7th Cir. 2007); *Ortiz v. Martinez*, 789 F.3d 722, 729 (7th Cir. 2015). Absent a fundamental miscarriage of justice, arguments based on the Sentencing Guidelines must be raised on direct appeal or not at all. *Martin v. United States*, 109 F.3d 1177, 1178 (7th Cir. 1996. "[A]djusting the offense level by two or three steps is exactly the routine decision that is supposed to be handled . . . on direct appeal." *Id.* (quoting *Durrive v. United States*, 4 F.3d 548, 551 (7th Cir.1993). The Seventh Circuit is "reluctant to allow prisoners to circumvent the rule against raising Sentencing Guideline arguments in collateral proceedings by recasting their Guidelines arguments as claims of ineffective assistance of counsel." *Id.* Only "Sentencing Guidelines errors of constitutional proportion" that resulted from an ineffective assistance of counsel may be considered. *Id.*

Second, Lewellen's petition does not meet the rigorous standard for § 2255 relief regarding sentencing issues. Ordinarily, in the post-*Booker* era in which the Sentencing Guidelines are not mandatory, relief is not available under § 2255 for errors in Guidelines calculations unless the error is of constitutional dimension. *Hawkins v. United States,* 706 F.3d 820, 826, 828

(7th Cir. 2013) (*Hawkins I*), citing *Welch v. United States*, 604 F.3d 408, 412 and n. 4 (7th Cir. 2010); *Hawkins v. United States,* 724 F.3d 915, 916 (7th Cir. 2013) (*Hawkins II*).

Lewellen argues that his attorney performed ineffectively at sentencing, resulting in the imposition of four enhancements that he claims were improper. 2255R 1 at 53-57. But his attorney vigorously challenged the four enhancements in her objections to the presentence investigation report and during the sentencing hearing itself, including arguing that the witnesses whose testimony the government relied upon were incredible. R. 1318, 1396. At the sentencing hearing, the trial court rejected the defense's challenges and found that the enhancements were proper after assessing the credibility of government's witnesses. The court's conclusions were, in part, based on the large amount of evidence corroborating the challenged testimony. For example, regarding drug quantity, the court explained: "I'm not tremendously impressed by the credibility of David Venegas, or Lisette is an even bigger problem as far as I'm concerned, but there were numerous other witnesses corroborating them." R. 1396 at 35, 41-44, 50; *see also id.* at 50-42, 56-57, 61 (imposing firearms enhancement based on credible testimony of Umar and Rodriguez); *id.* at 52-53, 56-57 (imposing enhancement for improper restraint based on credible testimony of Umar and Rodriguez); *id.* at 67-79 (imposing

29

obstruction enhancement based in part on consistent testimony of Ruiz-Cortez, Lisette Venegas, and Rodriguez); *id*. at 84-87 (imposing obstruction enhancement for compromise of the wiretap after finding account of Andre Torres to be credible).

Lewellen's assertion that his attorney should have done more is baseless. The tactics Lewellen claims his attorney should have used would have been cumulative of the arguments already made, at trial and sentencing, that the government's witnesses were not to be believed. This is essentially a challenge to the trial court's credibility findings at sentencing, which Lewellen could have but failed to appeal, and his attorney's decision not to make precisely the arguments that Lewellen now presses is not an error of constitutional dimension that warrants collateral relief.

In any event, any error at sentencing was harmless. Even had Lewellen successfully challenged all four enhancements, his final offense level would have been 38, and his range of imprisonment would have been 235 to 293 months. This range is above the sentence he actually received, meaning that it would be reasonable to conclude that his sentence would not have changed. *See United States v. Butler*, 777 F.3d 382, 389 (7th Cir. 2015) ("We have held that 'where two Guidelines ranges overlap . . . the technical dispute over which range to apply may be left unresolved . . . [a]s long as it is reasonable to

conclude that the same sentence would have been imposed regardless of the outcome of the dispute over which range to apply.' "); *see also United States v. Coleman*, 763 F.3d 706, 710 (7th Cir. 2014) ("[T]he difference from the actual (188–235 months) to the appropriate (140–175 at time of sentencing) range was much less significant here [with a sentence of 151 months] . . . the likelihood of a different sentence in light of the sentencing error is not an adequate basis to" impose § 2255 relief.) .

Finally, Lewellen received a sentence of only 18 years in a case involving egregious conduct by a police officer whose advisory guidelines range was life. This result is a testament to the skills of the very attorney that he claims was ineffective.

### 5. Lewellen is not entitled to pursue his Fifth Amendment Due Process claims via § 2255.

Lewellen argues that even if this Court determines that his trial attorneys were not ineffective, he is still entitled to relief as a result of alleged Fifth Amendment Due Process violations arising from alleged prosecutorial misconduct at trial regarding the purported presentation of false evidence at trial and by improper vouching by the prosecution during closing arguments.[5]

---

[5] Of course, the government denies that any prosecutorial misconduct occurred, but given that Lewellen is not entitled to pursue these claims in this motion, it will not

Lewellen is precluded from pursuing his prosecutorial misconduct argument on collateral review because he did not argue these issues on direct appeal.[6] *Cardena*, 842 F.3d at 986–87. He may not pursue arguments via § 2255 absent some showing of cause for not raising the arguments on direct appeal, and he offers no cause. Collateral review is not just a rerun of the direct appeal, in which a defendant can use hindsight to craft better arguments. *Ryan v. United States*, 645 F.3d 913, 915 (7th Cir. 2011) *vacated on other grounds*, 132 S. Ct. 2099 (2012). Societal interests in the finality of judgments, and in inducing parties to focus their energies on the trial and initial appeal, limit the scope of collateral review. *Id.* The failure to raise an issue on direct appeal—even a constitutional claim—bars it from being raised in a collateral attack under § 2255, unless the defendant shows either good cause for failing to raise it on appeal, and resulting prejudice, or that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998). Where a defendant does not argue "cause" for his failure to raise his prosecutorial-

discuss them. The government seeks leave to amend this response should the court find it necessary to reach the merits of the claims.

[6] Lewellen prefaces his Due Process claims with the caveat that, even if his trial counsel was not ineffective, he is still entitled to § 2255 relief. He is incorrect. As noted above, in order to prevail on a claim of ineffective assistance of counsel, Lewellen must show unreasonable performance and an impact on the result of the proceeding. *Strickland*, 466 U.S. at 687-88. If the trial court finds that he has failed to meet either of these requirements, he is not entitled to relief. *Id.*

misconduct claim before collateral review, the appellate court will decline to excuse the procedural default and will not address the merits of the claim. *Delatorre v. United States*, 847 F.3d 837, 844 (7th Cir. 2017)

## CONCLUSION

Lewellen is not entitled to an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Bruce v. United States*, 356 F.3d 592, 597 (7th Cir. 2001). When reviewing the evidence, courts draw all reasonable inferences in the light most favorable to the government. See *Carnine v. United States*, 974 F.2d 924, 928 (7th Cir. 1992). An evidentiary hearing must be held if the petitioner "alleges facts that, if proven, would entitle him to relief." *Sandoval v. United States,* 574 F.3d 847, 850 (7th Cir. 2009). However, no evidentiary hearing is necessary if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001), quoting Title 28 U.S.C. § 2255.

The record before the court shows that Lewellen's contentions lack merit. Therefore, his petition should be denied in its entirety, without a hearing, consistent with the case law cited above.

Respectfully Submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:   */s/ Madeleine S. Murphy*
MADELEINE S. MURPHY
Assistant U.S. Attorney
219 S. Dearborn, 5th Floor
Chicago, IL 60604
(312) 886-2070

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on February 1, 2019 in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, L.R. 5.5, and the General Order on Electronic Case Filing ("ECF") pursuant to the district court's system as to ECF filers.

By:    */s/ Madeleine S. Murphy*
MADELEINE S. MURPHY
Assistant U.S. Attorney
219 S. Dearborn, 5th Floor
Chicago, IL 60604
(312) 886-2070