UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 18-CV-6864 |
| v. | ) | |
| | ) | Hon. Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

### GLENN LEWELLEN'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS 28 U.S.C. § 2255 PETITION

The Defendant, GLENN LEWELLEN, by and through his attorneys, JOSEPH R. LOPEZ and ADAM M. ALTMAN, submits the following reply to the government's response to his *Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody* (the "Habeas Motion"), and in support thereof, states as follows:

**I.    SUMMARY OF PRIOR ARGUMENTS**

On October 1, 2018, Mr. Lewellen filed his Habeas Motion and supporting memorandum, pursuant to 28 U.S.C. § 2255.[1] In his Habeas Motion, Mr. Lewellen asserted four primary reasons why his trial counsel, Andrea Gambino and Matthew Madden ("Gambino and Madden") were so ineffective that they denied his Sixth Amendment right to counsel. Those reasons are that they: 1) failed to use available evidence, and to investigate and find potential evidence, to contradict the prosecution's argument about Mr. Lewellen's "unexplained wealth;" 2) concealed evidence tending to exculpate Mr. Lewellen because of their fear that if they presented that evidence, it would result in them facing their own ethical or even criminal

---

[1] In its response, the government mistakenly stated that Mr. Lewellen filed his Habeas Motion on October 11, 2018. ECF No. 13 at 11. Mr. Lewellen originally filed on October 1, 2018, under case number 09-CR-00332. ECF No. 1790. This Court then assigned the case to its civil docket, under case number 18-CV-6864, on October 18, 2018.

complaints; 3) failed to raise the appropriate constitutional challenge to the prosecution's improper out-of-court witness identification procedures; and 4) did not present available evidence to contradict the prosecution's request for sentencing enhancements. In addition to those claims, Mr. Lewellen contended that the prosecution knowingly presented false evidence at trial and improperly vouched for it witnesses, in derogation to his Fifth Amendment due process rights.

The government responded to Mr. Lewellen's Habeas Motion on February 1, 2019, and in that response, repudiated all of his claims. ECF No. 13.[2] The government first concedes that the prosecution's evidence and argument regarding "unexplained wealth" was improper and the Court should not have allowed it, but it then argues that the error was harmless. *Id.* at 14-15. It next contends that even if Mr. Lewellen's trial counsel had a conflict of interest regarding their wrongful use of the bond money that he posted, that did not cause them to withhold relevant or useful evidence. *Id.* at 21-23. Furthermore, the government asserts that Mr. Lewellen had no Sixth Amendment right to have counsel present during the prosecution's improper courtroom window witness identifications, and that any error was harmless. *Id.* at 24-27. In addition, the government counters that Mr. Lewellen has procedurally defaulted raising any issues related to his sentencing, and that his sentence was legally reasonable. *Id.* at 27-31. Finally, the government responded that Mr. Lewellen cannot raise a prosecutorial misconduct challenge for the first time on collateral review, and that this Court should not address the merits of that claim. *Id.* at 31-33.

---

[2] This Reply cites references to the electronic docket in this case as "ECF" followed by the relevant docket entry, and cites references to the electronic record in Case. No. 09-CR-332 as "R." followed by the electronic case filing number of the relevant document, and the page numbers of that document. In addition, it cites references to the Trial Transcript as "Tr." followed by the relevant page number.

## II.   THIS COURT SHOULD GRANT MR. LEWELLEN'S HABEAS MOTION.

This Court should order an evidentiary hearing to resolve the factual issues that Mr. Lewellen has raised in his Habeas Motion. A hearing will allow Mr. Lewellen to further develop the record and demonstrate that he is entitled to relief because his trial counsel performed objectively unreasonable, and their egregious errors affected the outcome of his case. Furthermore, the prosecution violated Mr. Lewellen's Fifth Amendment right to due process by presenting false evidence, and advancing improper argument to the jury. Moreover, this Court has the power to remedy that constitutional error even though Mr. Lewellen's appellate counsel failed to raise the issue on direct appeal. The government's response does not assuage any of Mr. Lewellen's arguments, nor does it give this Court any other reason not to proceed with this matter. Hence, this Court should grant Mr. Lewellen's motion and vacate his conviction and sentence, and it should order any other relief that it deems just.

### A.   Mr. Lewellen's Habeas Motion Has Met the Threshold Requirements for this Court to Order an Evidentiary Hearing.

This Court should order an evidentiary hearing because Mr. Lewellen has satisfied the statutory requirements for such a hearing. Section 2255 of the United States Code provides that when a federal prisoner is in custody and moves the district court to "vacate, set aside or correct the sentence," the court must "grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(a) and (b). The only scenario where those requirements do not apply is when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Hence, as long as the petitioner "alleges facts that, if proven, would entitle him to relief," the district court must grant an evidentiary hearing. *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994).

The Seventh Circuit has held that "in order for a hearing to be granted, the petition must be accompanied by a detailed and specific affidavit showing that the petitioner had actual proof of the allegations going beyond mere unsupported assertions." *Prewitt v. United States*, 83 F.3d 812, 819 (7th Cir. 1996). Although "[m]otions to vacate a conviction or sentence ask the district court to grant an extraordinary remedy," the petitioner can move this process forward to an evidentiary hearing by satisfying a "threshold showing." *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006). The Seventh Circuit has further explained that the petitioner clears that "threshold requirement" for a hearing by "submit[ting] a sworn affidavit showing what specific facts support the petitioner's assertions." *Id.* at 1067 (quoting *Galbraith v. United States*, 313 F.3d 1001, 1009 (7th Cir. 2002)).

In *Kafo*, for example, defendant Saidi Kafo pleaded guilty to three charges of forgery crimes, and after the district sentenced him to 48 months' imprisonment, Kafo filed a § 2255 motion. 467 F.3d at 1065. In that motion, Kafo argued, among other issues, that his counsel was ineffective because he failed to file an appeal. *Id.* The district court denied Kafo an evidentiary hearing, explaining that the issues he asserted in his motion were "unsubstantiated." *Id.* at 1067. The Seventh Circuit vacated and remanded the case, explaining that even though the district court "noted a complete lack of evidence of the claimed ineffectiveness," Kafo had submitted an unverified amended motion, that if the court had accepted, "would have constituted at least *some* evidence of his allegations," and warranted further proceedings. *Id.* at 1070-1071 (emphasis in original).

Like *Kafo*, in *Bruce v. United States*, the district court denied the defendant an evidentiary hearing on his § 2255 motion. 256 F.3d 592 (7th Cir. 2001). In that case, defendant James Bruce was convicted of bank robbery, and in his § 2255 motion, he argued that his trial

counsel, who was also his appellate counsel, was ineffective for failing to investigate alibi witnesses. *Id.* at 593. The Seventh Circuit reversed the district court, and remanded the case for a hearing. *Id.* at 600. The Court opined that an evidentiary hearing was necessary so that the district court could determine whether Bruce's trial counsel made "reasonable professional judgments" that supported a "less than complete investigation" regarding Bruce's proffered alibi witnesses. *Id.* at 598.

More recently, in *Sawyer v. United States*, a jury convicted defendant Datqunn Sawyer of multiple crimes involving sex trafficking, and the court sentenced him to 50 years' imprisonment. 874 F.3d 276, 278 (7th Cir. 2017). Following his unsuccessful appeal, Sawyer filed a habeas motion, arguing in part that his trial counsel was ineffective for advising him not to take a plea offer. *Id.* The district court denied Sawyer's petition, and found that an evidentiary hearing was unnecessary because Sawyer had failed to attach either the proposed plea agreement in question, or an affidavit from his trial counsel. *Id.* The Court noted that Sawyer had provided other affidavits with his petition. *Id.* at 279. It rejected the government's argument that those supporting affidavits were inconsistent and unreliable, stating that the affidavits "present precisely the types of factual issues the district court must resolve through an evidentiary hearing." *Id.* The Seventh Circuit found that the district court abused its discretion by not granting a hearing, it vacated and remanded the case. *Id.* at 279-280.

In this case, Mr. Lewellen alleged facts in his Habeas Motion, that once he proves, will entitle him to relief. He submitted a detailed affidavit describing the facts and circumstances of how Gambino and Madden usurped the money that he posted with this court for his bond. ECF No. 3, Exhibit 11. Moreover, the affidavit explains that the government was investigating his attorney Andrea Gambino, and even asked Mr. Lewellen to cooperate with them and possibly

testify in a prosecution against his counsel. *Id.* Moreover, he also filed an affidavit from his former accountant, Melissa Schwartz. ECF No. 3, Exhibit 1. In that affidavit, Ms. Schwartz stated that she was available to testify at trial, and to provide critical financial records on behalf of Mr. Lewellen's defense. *Id.* Likewise, she stated that Mr. Lewellen's trial counsel did not call her to testify at trial, despite the valuable information that she had to offer.

In addition, Mr. Lewellen filed 20 other exhibits, including deposition transcripts, police reports, financial records, and other professional reports, all lending support to Mr. Lewellen's claims that his trial counsel's failure to use available evidence was objectively unreasonable, and prejudiced his case. For example, Gambino and Madden should have used available evidence that would have destroyed the credibility of Fares Umar, one of the government's primary witnesses against Mr. Lewellen. Umar testified that he and Mr. Lewellen committed crimes together on September 11, 2001; Mr. Lewellen's employee Jim Millner had an account of spending time with Mr. Lewellen on that date, and his attorney Michael Mann contacted Gambino to discuss this information, but she did nothing with it. This and other facts that Mr. Lewellen asserted in his Habeas Motion and supporting Memorandum and exhibits show that Gambino and Madden were constitutionally ineffective and he is entitled to relief.

In *Kafo*, the Seventh Circuit remanded the case, even where the district court had found "a complete lack of evidence" regarding the defendant's claim of ineffective assistance of counsel. 467 F.3d at 1070. Here, by contrast, Mr. Lewellen raised a variety of factual claims, supported by evidence, that if proven true, would unquestionably substantiate his argument that his trial counsel was ineffective. The *Kafo* Court remanded that case because it found that the defendant had produced "*some* evidence," to support his allegations. 467 F.3d at 1070. In this

case, Mr. Lewellen has more than surpassed that low bar, he has produced abundant evidence that validate his various arguments, and warrant further proceedings.

Furthermore, like the defendant's trial counsel in *Bruce*, the facts and documents that Mr. Lewellen has provided show that his counsel executed a "less than complete investigation." 256 F.3d at 598. Just as the appellate court held in that case, here, this Court should grant an evidentiary hearing to determine whether the lackluster investigation was based on reasonable professional judgment, or his attorneys' deference to their own interests. Similar to the defendant in *Sawyer*, in this case, Mr. Lewellen has included affidavits and other supporting documents with his verified Habeas Motion. In that case, the Seventh Circuit rejected the government's argument that Sawyer's proffered evidence was not conclusive. 874 F.3d at 279. Likewise, here, the government raised the same issue in its response, arguing that Mr. Lewellen's supporting evidence is not conclusive enough to warrant a hearing. ECF No. 13 at 33-34. But contrary to that argument, and just like the *Sawyer* case, Mr. Lewellen has presented "precisely the types of factual issues" that if proven, would entitle him to relief. 874 F.3d at 279.

The Seventh Circuit has explained that "[t]he petitioner's burden for receiving an evidentiary hearing is relatively light." *Torres-Chavez v. United States*, 828 F.3d 582, 586 (7th Cir. 2016). If "there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999); *see also United States v. Khera*, 2013 WL1165020, *2 (E.D. Cal. Mar. 20, 2013) (explaining that the district court recommended an evidentiary hearing where "movant had stated a colorable claim of ineffective assistance of counsel"). Mr. Lewellen has enumerated a wide range of factual disputes, and he should be entitled to further develop the record through additional discovery and a hearing. This Court should grant Mr. Lewellen an evidentiary hearing,

so that he can prove the factual issues that he raised in his Habeas Motion and through the supporting documents that he filed.

> **B.      Mr. Lewellen's Trial Counsel Performed Objectively Unreasonable, and Their Deficient Performance Changed the Outcome of the Case.**

This Court should grant Mr. Lewellen an evidentiary hearing so that he can further expose the reasons why his trial counsel was constitutionally ineffective. First among those, was that his counsel failed to competently address the prosecution's argument that Mr. Lewellen's financial position was "unexplained." Related to that problem, Gambino and Madden refused to advance exculpatory evidence and arguments about Mr. Lewellen's finances because they feared that it would lead to their own disciplinary and legal problems. In addition, his counsel failed to raise the proper arguments against the prosecution's unconstitutional witness identification methods, and also abandoned viable objections to Mr. Lewellen's sentencing enhancements. Thus, this Court should vacate Mr. Lewellen's conviction and sentence.

> ### 1.      *Mr. Lewellen's Trial Counsel Was Ineffective for Not Presenting Evidence About His Financial Situation.*

Gambino and Madden had evidence at their disposal, which they could have used to dispel the prosecution's contention that Mr. Lewellen's financial position was "unexplained." Moreover, had they undertaken a reasonable investigation, they could have uncovered additional evidence to support that argument. Likewise, his trial counsel allowed their own personal financial interests to negatively impact Mr. Lewellen's defense.

Under *United States v. Carrera*, evidence of unexplained wealth is admissible when: 1) it is indicative of the defendant's involvement in drug trafficking; 2) the defendant acquired the wealth in question during the relevant time period of the alleged drug crimes; and 3) the government's other evidence supports the charges, and shows that the defendant did not legally

8

obtain the wealth. 259 F.3d 818, 829 (7th Cir. 2001). In this case, the prosecution's closing

argument included references to Mr. Lewellen having unexplained wealth. The prosecution

argued that Mr. Lewellen paid for luxury cars and his house, not with his income from the

Chicago Police Department, but from money that he obtained through drug-trafficking. Tr. 5368

- 5373. Both this Court, and the Seventh Circuit, addressed this issue and ruled that although the

prosecution's evidence failed the *Carrera* test, the error was harmless. R. 1152 at 10; *United

States v. Cardena*, 842 F.3d 959, 986-987 (7th Cir. 2016).

> In its response, the government erroneously conflates the unexplained wealth argument
that Mr. Lewellen already raised before this Court, and on appeal, with the ineffective assistance
of counsel issue that he asserted in his Habeas Motion. The government argues that even
assuming that Gambino and Madden performed deficiently at trial, Mr. Lewellen cannot satisfy
*Strickland's* prejudice prong. ECF No. 13 at 14 (citing *Strickland v. Washington*, 466 U.S. 668
(1984)). Its response stated that the Seventh Circuit's "conclusion mandates the dismissal of
Lewellen's arguments on collateral review." *Id.* Likewise, the government argues that Gambino
and Madden's decision not to use evidence about Mr. Lewellen's finances was a prudent
"defense tactic" because if they had advanced such evidence, it would have immolated any
*Carrera* challenge to the prosecution's unexplained wealth theory. *Id.* at 15. The government's
circular argument is as illogical as it is invalid.

> Contrary to the government's assertions, Mr. Lewellen is not now merely re-hashing the
same argument that he advanced in post-trial motions before this Court, and in his appeal.
Rather, the crux of his habeas argument on this issue is that characterizing Mr. Lewellen's
"wealth" as "unexplained," was a cornerstone issue for the government's case, which it
emphasized during closing argument: "[m]oney doesn't lie. Luxury cars don't lie. Classic cars

paid for with cash. That doesn't lie. A huge house after retiring from police department. That doesn't lie either." Tr. 5368. Hence, Gambino and Madden should have rebutted that argument with evidence that they had available at trial, and that which they could have uncovered through diligent and reasonable investigation. Their failure to do so was objectively unreasonable, and resulted in prejudice to Mr. Lewellen.

The government contends that the Seventh Circuit found that "the evidence of Lewellen's cash expenditures was admissible as evidence of his participation in the conspiracy," and that even if Gambino and Madden had "objected or provided additional argument in favor of the objection, the appellate court already has determined" that the evidence was "properly admitted." ECF No. 13 at 16. Again, that argument completely misconstrues Mr. Lewellen's habeas argument for this issue. The Habeas Motion does not claim that Gambino and Madden were ineffective for failing to make a more complete record that the prosecution's unexplained wealth evidence failed the *Carrera* test. Instead, Mr. Lewellen's contention is that his trial counsel's decision to not refute the prosecution's unexplained wealth argument was objectively unreasonable.

Mr. Lewellen's accountant, Melissa Schwartz, was available to testify at trial regarding the financial strength of Mr. Lewellen's homebuilding business, Lewellen Home Builders. Gambino and Madden could have called her to testify and done nothing more than move to admit into evidence the tax records that she prepared. At least that would have shown the jury tangible proof of Mr. Lewellen's profitable business. But not only did Gambino and Madden fail to do that, they did not even contact Mr. Schwartz to find out what information she had to offer in Mr. Lewellen's defense. *See* ECF No. 3, Exhibit 1.

The government contests this argument, citing *United States ex rel. Simmons v. Gramley* for the proposition that when a habeas petitioner argues that his trial counsel failed to investigate, he "must present 'a comprehensive showing as to what the investigation would have produced.'" ECF No. 13 at 16-17 (quoting *Gramley*, 915 F.2d 1128, 1133 (7th Cir.1990)). But the government's reliance on *Gramley* does nothing more than demonstrate exactly why this Court should hold an evidentiary hearing. The "comprehensive showing" direction from *Gramley* was a verbatim cite to *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987). In *DeRobertis*, the district court held an evidentiary hearing, but at that habeas hearing, the petitioner failed to call witnesses to provide the proffered testimony that he claimed was "missing" from his trial. *Id.* Thus, the appellate court explained that "[w]hen the allegation of the ineffectiveness of counsel centers on a supposed failure to investigate . . . we would expect that such information would be presented to the habeas court through the testimony of the potential witnesses." *Id.* The Seventh Circuit went on to explain that "if the potential witnesses are not called, it is incumbent on the petitioner to explain their absence and to demonstrate, with some precision, the content of the testimony they would have given at trial." *Id.* The government's reliance on *Raygoza v. Hulick*, also offers no help because in that case, the state habeas court held an evidentiary hearing, though the federal habeas court denied to order a second hearing. 474 F.3d 958, 961 (7th Cir. 2007).

The *DeRobertis* decision strengthens Mr. Lewellen's argument that a hearing is warranted here. Unlike that case, where the petitioner did not provide the proposed "missing" testimony at the habeas hearing, in this case, Mr. Lewellen has various witnesses who could testify regarding the testimony that they could have given at trial to rebut the prosecution's unexplained wealth argument. In addition to Ms. Schwartz, he could call former IRS employee

11

Robert Kennealy as a witness; Mr. Kennealy could testify about the financial report that he prepared for Mr. Lewellen, and how it differed from the fragmentary financial exhibits that the prosecution presented to the jury. ECF No. 3, Exhibit 2. Likewise, Deborah Lewellen could testify about her personal injury settlement and her gambling winnings, and how they helped Mr. Lewellen's financial position. ECF No. 3, Exhibits 3 and 4. So too could Mr. Lewellen call his former police partner James Entress's wife Aggie, or their neighbor Tom Monday, to testify about how James Entress and Mr. Lewellen each made hundreds of thousands of dollars in a sports bookmaking partnership.

All of this evidence related to Mr. Lewellen's finances tended to show that his wealth was not at all "unexplained." Rather, he had many hundreds of thousands of dollars that were available to him, none of which he got from participating in the alleged conspiracy for which the government prosecuted him. Gambino and Madden had this evidence at their disposal, either through use of the information they knew about, or through diligent investigation. Yet, they used none of that evidence at trial, and instead let the prosecution's unexplained wealth argument go unhindered and unrebutted. That was objectively unreasonable, and because the argument was instrumental to the prosecution's case, Gambino and Madden's mismanagement of the evidence prejudiced Mr. Lewellen.

### 2. *Mr. Lewellen's Trial Counsel Was Ineffective for Allowing Their Personal Interests to Prejudice Their Client's Defense.*

Mr. Lewellen's trial counsel allowed their pecuniary and other personal interests to dictate the defense that they presented. Gambino and Madden misused the bond money that Mr. Lewellen posted, which prevented them from presenting decisive evidence and arguments about his finances. Because his trial counsel's conflict caused them to give priority to their own interests instead of to advance Mr. Lewellen's defense, this Court should grant relief.

12

Under *Strickland*, a defendant can prevail on an ineffective assistance of counsel claim by showing that his counsel's performance was deficient, and that the deficient performance prejudiced his case. 466 U.S. at 687. The petitioner can satisfy *Strickland's* deficient performance factor by identifying "acts or omissions by counsel that fell below an objective standard of reasonableness and could not have been the result of professional judgment." *Campbell v. Reardon*, 780 F.3d 752, 762 (7th Cir. 2015). With regard to *Strickland's* prejudice prong, the petitioner's burden of proof depends upon the issues that he is claiming. For example, where the petitioner bases his ineffective assistance claim on counsel's conflict of interest, he "bears a lighter burden with regard to demonstrating prejudice." *Spreitzer v. Peters*, 114 F.3d 1435, 1450 (7th Cir. 1997). The *Spreitzer* Court explained that "'[b]ut for' prejudice need not be shown in these situations because 'the existence of a conflict itself demonstrates a denial of effective assistance of counsel.'" *Id.* (quoting *United States v. Fish*, 34 F.3d 488, 492 (7th Cir. 1994). Accordingly, a "presumption of prejudice is necessary because a true conflict of interest forecloses the use of certain strategies and thus the effect is difficult if not impossible to measure." *Fish*, 34 F.3d at 492.

In cases where the district court did not know about defense counsel's conflict of interest, the petitioner must show that counsel "actively represented conflicting interests." *United States v. Pergler*, 233 F.3d 1005, 1010 (7th Cir. 2000). More plainly, the petitioner must demonstrate that "his attorney was influenced by the conflict in making 'basic strategic decisions' in a manner adverse to the defendant." *Taylor v. Grounds*, 721 F.3d 809, 818 (7th Cir. 2013). Furthermore, an actual conflict of interest includes situations "where there is a danger that [counsel] would ineffectively represent his client because of fear that authorities might become

aware of the attorney's own misconduct." *Freeman v. Chandler*, 645 F.3d 863, 869 (7th Cir. 2011) (quoting *United States v. Balzano*, 916 F.2d 1273, 1293 (7th Cir. 1990).

Here, Gambino and Madden had an actual conflict of interest because they took $200,000 from a retirement account that Mr. Lewellen had posted as collateral for his bond. R. 355. The Court directed Gambino to request approval before trying to access the bond money. ECF No. 3, Exhibit 6. Despite that, Gambino instructed Mr. Lewellen to liquidate his retirement account to satisfy his attorneys' fees; she never requested leave of the Court to do so. Equally as troublesome, the cash that Gambino and Madden took was subject to forfeiture because Mr. Lewellen had acquired the money partly through the sportsbook that he was operating with James Entress. Mr. Lewellen warned Gambino of this problem before giving her the money, but she accepted the payment nonetheless, and never notified the Court.

The government's response to this issue misses the mark. It again relies on the contention that because the Seventh Circuit found harmless error in the admission of the prosecution's unexplained wealth evidence, the issue is meritless. ECF No. 13 at 21. But, of course, the Seventh Circuit's decision does not foreclose Mr. Lewellen from now raising the issue, not as an evidentiary error by the District Court, but as an ineffective assistance of counsel claim. The government then responds by stating that "Lewellen has failed to show that any conflict existed here." *Id.* at 22. That contention is erroneous, however, because if Mr. Lewellen can prove the truth of the allegations that he set forth in his affidavit, he is entitled to relief. In paragraphs two through 15 of his affidavit, for example, Mr. Lewellen describes exactly how Gambino and Madden procured his bond money, in violation of the Court's explicit instructions at the bond hearing. ECF No. 3, Exhibit 11. Assuming the truth and accuracy of those statements, Gambino and Madden would have had to steer clear of moving into the trial record, any detailed

14

accounting and other evidence of Mr. Lewellen's finances. Any thorough examination of Mr. Lewellen's finances at trial, would pose too great a risk of exposing the bond money misappropriation that his trial counsel had perpetrated.

Gambino would have been especially fearful of presenting evidence about Mr. Lewellen's finances. This is because she knowingly accepted criminally tainted money from Mr. Lewellen. Gambino knew this because Mr. Lewellen told her that he got the money in his retirement account from taking sports bets from Saul Rodriguez, who accumulated his money from dealing drugs. Gambino even warned Mr. Lewellen not to tell Madden that the retirement account was the product of illegal gambling proceeds and Rodriguez's drug racket. Presumably, Gambino was scared that if Madden knew this, he might refuse to proceed. When the government later investigated Gambino, Mr. Lewellen provided AUSA Block with this information, and even offered to take a polygraph test to demonstrate his truthfulness. ECF No. 3, Exhibit 10.

Likewise, Gambino could not risk the prospects of another ethical inquiry into her law practice. In 2004, Gambino had accepted as true, a complaint by the Attorney Registration and Disciplinary Commission that she had violated federal law by harboring an illegal alien, which resulted in the ARDC suspending her law license for one year. *In re Gambino*, No. M.R. 18878, 02 CH 81 (Ill. Sept. 24, 2003). Though a detailed evidentiary review of Mr. Lewellen's finances would have tended to exculpate him of the charged conduct, it also would have imperiled Gambino's law license. Gambino could not take a chance that the Court would find out that she: 1) instructed her client to use illegally obtained proceeds to post bond, 2) instructed her client to evade a court order regarding access to the bond money, 3) withheld information that she was ethically bound to disclose to the Court, and 4) kept all, or at least part of, this improper conduct

15

from her co-counsel. Facing the specter of additional professional sanctions, and possibly even criminal liability, Gambino disregarded her client's interests.

Gambino and Madden failed to rebut the prosecution's portrayal of Mr. Lewellen's financial well-being as "unexplained wealth," not because of any reasonable trial strategy, but because they feared that the Court might become aware of their own misconduct. The Seventh Circuit considered a similar issue in *Lafuente v. United States*, 617 F.3d 944 (7th Cir. 2010). In that case, defendant Fabian Lafuente filed a habeas petition in which he argued "that he was denied conflict-free representation because at the time of trial, his counsel, Andrea Gambino, had violated federal law by harboring an alien." *Id.* at 945. The district court denied Lafuente's petition without a hearing, but the Seventh Circuit remanded the case, explaining that "Lafuente's allegations, if believed, entitle him to relief." *Id.* at 946. The Court also noted that "[a]lthough Lafuente will eventually have to show that Gambino had an actual fear" that authorities would discover her misconduct, "at this stage, his motion adequately alleges a claim that would entitle him to relief if proven." *Id.* Furthermore, the Court disagreed with the government's argument that Lafuente's bare bones affidavit was not enough to warrant a hearing. *Id.* The Court explained, "it is not within Lafuente's ability to have personal knowledge of whether Gambino was under investigation or feared investigation . . . Lafuente's allegation will require further investigation before it can be confirmed." *Id*.

Just like in *Lafuente*, here, Mr. Lewellen has alleged a claim, that once he proves, will entitle him to relief. He has stated that his trial counsel was conflicted, which caused them to make unreasonable trial choices that were detrimental to Mr. Lewellen's defense. He supported those statements with his own affidavit, and a wide variety of other evidence showing that Gambino and Madden tailored the defense around their fear that the Court would discover what

16

they had done with Mr. Lewellen's bond money. Also, by contrast to the meager affidavit at issue in *Lafuente*, in this case, Mr. Lewellen's affidavit includes all of the details relevant to his claim. For example, in paragraphs 19 through 21, he details how, during a timeframe of less than three months, he went from thinking that he could face sanctions for a bond violation, to learning that Gambino was the one who had usurped the bond money and was under federal investigation. ECF No. 13, Exhibit 11.

Even assuming this Court disregards all of the facts that Mr. Lewellen has argued here, it would still be bound, under *Lafuente*, to at least grant a hearing here. In *Lafuente*, the Court clearly explained that in the beginning phase of a habeas claim, a defendant may not have unassailable proof of his trial counsel's fear of the district court discovering their misconduct. 617 F.3d at 946. At this stage of the case, Mr. Lewellen need not have conclusive personal knowledge of whether his trial counsel feared the District Court discovering their conduct. Rather, Mr. Lewellen's allegations, which he has supported with an affidavit and a plethora of other evidence, requires that this Court grant additional discovery and an evidentiary hearing. This will allow him to conclusively prove that Gambino and Madden built his defense around their own interests rather than Mr. Lewellen's best interests.

### 3. Mr. Lewellen's Trial Counsel Was Ineffective for Failing to Raise the Appropriate Constitutional Challenge to the Prosecution's Witness Identification Procedure.

In addition to the ineffective assistance that Mr. Lewellen's counsel provided due to their conflict of interest, they also failed to assert a Sixth Amendment challenge to the prosecution's courtroom window witness identification scheme. Had they made the proper objection at trial, the District Court could have fashioned an appropriate remedy. Because Gambino and Madden waived that objection, however, the Court could not effectively cure the prosecution's

17

wrongdoing, and the appellate court could not fully review the constitutional problem. Therefore, Mr. Lewellen's trial counsel was ineffective, and this Court should grant his Habeas Motion.

The government's response cites *United States v. Montgomery*, from the Ninth Circuit, as authority for its argument that Mr. Lewellen was not "entitled to have counsel present in the hallway at the time that the witnesses viewed him through the window." ECF No. 13 at 24 (citing *Montgomery*, 150 F.3d 983, 993-995 (9th Cir. 1998)). But as the Seventh Circuit explained in its opinion in this case, "[t]here appears to be a circuit split on the question of whether permitting a witness to identify the defendant in the courtroom prior to testifying violates the Sixth Amendment." *Cardena*, 842 F.3d 959 at 979 (*comparing United States v. Roth*, 430 F.2d 1137 (2d Cir. 1970) *and Cannon v. Alabama*, 558 F.2d 1211 (5th Cir. 1977) *with Montgomery*.

The *Montgomery* case is, of course, not binding on this Court, and the Seventh Circuit did not issue any holding on the issue that would control this Court, "[w]e decline to wade into the circuit split." *Cardena*, 842 F.3d at 979. But even if this Court were to review *Montgomery* as persuasive authority, that would not help decide this case because the facts from that case are fundamentally different than those that are before this Court. In *Montgomery*, the Ninth Circuit reviewed the defendant's Sixth Amendment challenge to the prosecution's questionable out-of-court witness identification method through the lens of the defendant's confrontation rights. 150 F.3d at 995. The Court explained that the defendant's counsel "effectively reconstructed" the witness identification event "through cross-examination of the identification witness." *Id.* In other words, the defendant had the opportunity to cross-examine the witness about his out-of-court identification of the defendant, and to expose to the jury the weaknesses in that identification procedure. The Ninth Circuit ruled that "[u]nder the circumstances presented in

this record," the witness's out-of-court identification of the defendant "did not deprive him of his right to counsel." *Id.*

Unlike the circumstances presented in the *Montgomery* record, in this case, Mr. Lewellen had no opportunity to cross-examine the witnesses about the improper courtroom window identifications. This is because Mr. Lewellen and his co-defendants did not even find out about the identifications until after the prosecution had already conducted them. Hence, Mr. Lewellen could not "effectively reconstruct" the witness identification events during cross-examination. If, upon learning about the out-of-court identifications, his counsel had raised a contemporaneous Sixth Amendment objection, the Court could have cured the error by ordering the witnesses back into court and allowing additional cross-examination. At a minimum, Gambino and Madden should have requested that the Court strike the in-court identifications from the record, and instruct the jury as to what the prosecution had done at the courtroom window. Because they failed to do so, however, Mr. Lewellen's trial counsel denied him the right of meaningful cross-examination, and were thus ineffective.

Gambino and Madden's failure to make a Sixth Amendment objection at trial also meant that on appeal, the Seventh Circuit would apply a deferential standard of review. In its response, the government claims that this is inconsequential because "Lewellen cannot establish that he was harmed by the ineffectiveness." ECF No. 13 at 26. Admittedly, the Seventh Circuit did find that although the "in-court identification dress rehearsals without the procedural protection of the jury's and counsel's gaze" were "a subversion of the long-standing tradition that a witness identify the defendant in the courtroom on the witness stand," any error was harmless. *Cardena*, 842 F.3d at 975.

19

But the Seventh Circuit based its harmless error finding on the understanding that the only witnesses who participated in the prosecution's subversive arrangement were "co-conspirators or business associates who had repeated interactions with Defendants." *Id.* It arrived at that conclusion without the benefit of evidence that is now in the record before this Court. Namely, David Venegas – who was one of the witnesses that participated in the prosecution's "identification dress rehearsal" – gave testimony in a subsequent case that he hardly knew Mr. Lewellen, had seen him only twice before, and did not even know Mr. Lewellen's name. ECF No. 3, Exhibit 12. Likewise, prosecution witness Fares Umar testified in a later case that he was only able to identify Mr. Lewellen out of a photo array after government agents directed him as to "who they were looking for, who they wanted me to pick out." ECF No. 3, Exhibit 18. This is consistent with Umar's attempt at identifying Mr. Lewellen at trial; when AUSA Reynolds asked him to point out Mr. Lewellen, Umar responded "[l]ooks like him right there." Tr. 897 (attached as Exhibit A). Thus, the more complete record shows that these witnesses did not necessarily know Mr. Lewellen. A more thorough cross-examination of the witnesses, including questions about their courtroom window identifications, could have exposed their lack of familiarity with him. Because his trial counsel did not raise a timely Sixth Amendment objection, however, Mr. Lewellen lost this opportunity to further test the witness' credibility. The error also resulted in the appellate court limiting its review of the issue. Accordingly, Mr. Lewellen's trial counsel was ineffective, and this Court should vacate his conviction and sentence.

### 4. *Mr. Lewellen's Trial Counsel Was Ineffective for Failing to Rebut the Prosecution's Requests for Sentencing Enhancements.*

Mr. Lewellen's trial counsel was also ineffective for not adequately contesting sentencing enhancements that the prosecution successfully moved the District Court to impose. Specifically, the Court assigned four sentencing enhancements that should not have applied to Mr. Lewellen's

case. Gambino and Madden could have submitted various pieces of evidence to rebut the application of those enhancements, but failed to do so. Accordingly, Mr. Lewellen's counsel was constitutionally ineffective, and this Court should vacate his sentence.

The government contends that Mr. Lewellen did not appeal the sentencing enhancements, and is thus "precluded from raising this challenge on collateral review." ECF No. 13 at 28. It cites *Martin v. United States*, 109 F.3d 1177 (7th Cir. 1996) and *Durrive v. United States*, 4 F.3d 548 (7th Cir. 1993) in support of that proposition. *Id.* The government's argument is fatally flawed for at least two reasons. First, the United States Supreme Court invalidated holdings from *Martin* and *Durrive* in *Glover v. United States*, 531 U.S. 198 (2001). But more importantly, Mr. Lewellen could not have successfully raised this issue on direct appeal; much of the evidence that proves his counsel was ineffective was not available because it was not in the appellate record. *See Paters v. United States*, 159 F.3d 1043, 1047 (7th Cir. 1998).

For example, a letter from Jason Coday discredits the testimony of convicted felon Fares Umar. ECF No. 13, Exhibit 17. Umar claimed that he and Mr. Lewellen were committing criminal acts together on September 11, 2001, but Coday's letter completely discredits that testimony, Mr. Lewellen was with Coday during part of that day. *Id.* Mr. Lewellen was also with his employee Jim Millner on that day, a fact that Mr. Lewellen explains in a signed declaration (Exhibit B). Millner's attorney tried to give that information to Gambino; a note that Gambino wrote confirms this (Exhibit C), but she did nothing with this information at trial or at sentencing and instead let Umar's false testimony stand. Umar's testimony was important at sentencing because the Court accepted his fabricated story that sometime in 2003, Mr. Lewellen was wearing a bulletproof vest, police badge, and gun, while participating in a kidnapping and drug crime with Umar. Gambino and Madden could have used Coday's letter to show the Court that

Umar was a liar and it should not accept his testimony at all, and hence could not apply two separate enhancements for possessing a dangerous weapon, and abusing a position of trust, while committing a drug offense.

Furthermore, the affidavit of CPD Officer Brad Williams shows that Mr. Lewellen often did not carry his service revolver. ECF No. 3, Exhibit 19. Mr. Lewellen's failure to carry his firearm was not rooted in a disregard for his work responsibilities, but rather, was related to his apprehension to have to discharge his weapon. This is because in or about 1990, while on duty, Mr. Lewellen and another officer responded to a bar fight involving an armed man, the man lunged at Mr. Lewellen's colleague, and Mr. Lewellen wounded the man. Although everyone survived the incident, it scarred Mr. Lewellen, and left him fearful of ever having to use his firearm again. All of this information tended to make it less probable that Mr. Lewellen would have carried a firearm while participating in any alleged drug crime. This information was available for Gambino and Madden to use at trial, but they did not, and thus it never made the appellate record.

Similarly, a police report from CPD Officer Mendez tended to show that Mr. Lewellen testified truthfully at Refugio Cortez-Ruiz's criminal trial, and therefore the Court should not have enhanced his sentence for testifying falsely in that case. Mendez's report was not only his own account of those events, but also encompassed those of DEA Special Agents Matsumoro and Barnum, who both witnessed Ruiz's statements to Mendez in which Ruiz completely contradicted Lisette Venegas's nonsense story. Again, that evidence was not available for Mr. Lewellen's appellate argument because it was not in the record. Likewise, notes from a DEA agent showed a substantial relationship between CPD Officer Joe DiGiacomo, Andres Torres, and Saul Rodriguez. ECF No. 3, Exhibit 20. That evidence contradicted the prosecution's

assertion that Mr. Lewellen was responsible for interfering with a wiretap of Saul Rodriguez; and thus, Mr. Lewellen's counsel could have used it to overcome the prosecution's argument for a sentencing enhancement on that issue. But Gambino and Madden did not put that evidence in the record, and thus it is only now available on collateral review.

Mr. Lewellen's trial counsel had sufficient evidence at their disposal to overcome the prosecution's arguments for sentencing enhancements. Their failure to present and argue in favor of that evidence was error and it denied Mr. Lewellen effective assistance of counsel. Furthermore, because Gambino and Madden did not put the relevant evidence into the record, it was not available for Mr. Lewellen's appeal. Therefore, this Court should grant this Habeas Motion, and vacate Mr. Lewellen's sentence.

### C. The Prosecution Violated Mr. Lewellen's Due Process Rights, and This Court Has the Power to Review This Constitutional Claim.

The prosecution presented evidence that it knew, or should have known, was false. Furthermore, the prosecution also improperly vouched for the veracity of one of its primary witnesses against Mr. Lewellen. Both of those transgressions violated Mr. Lewellen's Fifth Amendment right to due process. This Court can now review this error even though Mr. Lewellen did not raise it on direct appeal, and it should grant relief accordingly.

In *Napue v. Illinois*, the United States Supreme Court held that a prosecution witness's false testimony that "may have had an effect on the outcome of the trial" cannot support a conviction. 360 U.S. 264, 269 (1959). This principle applies even where the prosecution, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* A reviewing court must overturn a conviction that rests on the prosecution's knowing use of false testimony "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The rule against

23

prosecutorial use of false evidence "includes 'half-truths' and vague statements that could be true in a limited, literal sense but give a false impression to the jury." *United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011). Also, the defendant need not show "conclusive proof that the testimony was false . . . all that matters is that the district court finds that the government has knowingly used false testimony." *Id.*

Here, the prosecution presented Lisette Venegas's testimony, which it should have known was false. She testified that Mr. Lewellen forcibly took a bag of cocaine from her in 1999. Tr. 547-749. But testimony from CPD Officer Noel Sanchez completely contradicted that fabrication, and his testimony was supported by CPD Officer Jamie Mendez's police report - which was also corroborated by DEA Special Agents Matsumoro and Barnum. ECF No. 3, Exhibit 13. Likewise, Venegas herself contradicted her trial testimony in a later deposition, explaining that she did not even know Mr. Lewellen. ECF No. 3, Exhibit 14. The prosecution also knowingly presented David Venegas's false testimony. Like his wife, David also later came clean in a deposition, explaining that he made up his testimony against Mr. Lewellen after his "sessions with the government" where he learned the true intentions: "I knew they were after [Mr. Lewellen]; he was a cop." ECF No. 3, Exhibit 12.

The prosecution also allowed Fares Umar to testify falsely. They knew that Mr. Lewellen was not riding in a police-style car and helping Umar prepare to kidnap Jimmy Lopez in May 2003 because they had evidence that Umar had not even purchased the car in question until June 2003. Likewise, the prosecution knew that Umar and Mr. Lewellen did not have a longstanding relationship because Umar had difficulty identifying Mr. Lewellen in a phot array. ECF No. 13, Exhibit 18. That difficulty was consistent with Umar's inability to definitively identify Mr. Lewellen at trial. The prosecution asked, "[d]o you see the person that you know as Glen[n], or

24

Murdock, here in court today?" Tr. 897. Umar answered, "[l]ooks like him right there." *Id.* Yet, that information did not stop the prosecution from arguing that they knew each other for "years and years and years." Tr. 2525. Likewise, Umar's difficulty in identifying Mr. Lewellen was the event that prompted AUSA Reynolds to orchestrate the inappropriate courtroom window identification plan. The government could not risk having another of its critical witnesses give a shaky identification on the witness stand. Hence, AUSA Reynolds directed her husband, DEA Agent David Reynolds, to start having witnesses identify defendants through the courtroom window. The government would stop at nothing to convict Mr. Lewellen, its agents had no interest in comporting their case and conduct with the inconveniences of justice, fairness, or Mr. Lewellen's constitutional rights.

Furthermore, during closing argument, the prosecution improperly vouched for Umar's credibility, bringing his name up more than 100 times. Despite knowing that Umar had not testified truthfully, they argued about how his testimony was "absolutely damning for Glenn Lewellen," and that Umar "never wavered" on the witness stand. Tr. 5034. Those statement show just how essential of a witness Umar was to the prosecution case. The prosecution vigorously pushed his testimony as the truth because without it, they could not have won a conviction.

In its response, the government argues that Mr. Lewellen has procedurally defaulted this issue because he did not raise any of it on direct appeal. ECF No. 3 at 32. That argument is incorrect. Even where a defendant has not argued an issue on direct appeal, he can still raise it in a habeas petition by showing "cause" for the failure to raise it earlier, and "prejudice" therefrom. *Murray v. Carrier*, 477 U.S. 478 (1986). A petitioner satisfies the "cause" component of the test by showing "some external impediment that prevented petitioner from raising the claim." *United*

*States ex rel. Prewitt v. Gilmore*, 1999 WL 286087 *6 (N.D. Ill. April 27, 1999) (citing *Carrier*, 477 U.S. at 488). Moreover, in *Edwards v. Carpenter*, the Supreme Court explained that "[c]ounsel's ineffectiveness in failing properly to preserve a claim" qualifies as "cause." 529 U.S. 446, 453-454 (2000).

Here, Mr. Lewellen's trial counsel was the "cause" that excused him from not raising the prosecutorial misconduct claim in his direct appeal. Gambino and Madden failed to properly preserve the claim. Although they did raise the issue in the district court, they did so through a post-trial motion, and by that point it was too late. As this brief enumerated in Section B, Gambino and Madden were ineffective for failing to put crucial evidence into the record, which could have proven prosecutorial misconduct, among Mr. Lewellen's other claims. For example, Officer Jamie Mendez's police report showed that Lissette Venegas's testimony was false, Mr. Lewellen did not participate with her in a drug crime at Refugio Ruiz-Cortez's home in 1999; Gambino and Madden had this evidence but did not confront Venegas with it during cross-examination. ECF No. 3, Exhibit 13. Similarly, Gambino and Madden had notes from DEA agents showing that the prosecution knew about the money that Mr. Lewellen had from his sports gambling venture, but they did not move those notes into the record. *See* ECF No. 3, Exhibit 5.

But even if Mr. Lewellen's trial counsel was not the impediment that prevented him from raising this issue on direct appeal, another excusing "cause" is new evidence. Some of the evidence that supports this claim was not available at trial or even during his appeal. A petitioner can assert a new issue in a request for relief under § 2255 if he can show that "he could not have produced the evidence at trial without due diligence." *United States v. Hope*, 1993 WL 135751, *3 (N.D. Ill. 1993) (citing *United States v. Hedman*, 655 F.2d 813, 815 (7th Cir. 1981). Also,

"'[n]ew evidence' in this context does not mean 'newly discovered evidence'; it just means evidence that was not presented at trial." *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016). Furthermore, this Court has "inherent equitable authority to permit supplementation of the record" on habeas review, and thus can consider the new evidence that was not before the court at Mr. Lewellen's trial, or in the record on appeal. *Brown v. Watters*, 599 F.3d 602 n. 1 (7th Cir. 2010). Moreover, new evidence can support a petitioner's claim of prosecutorial misconduct even where he raises that argument for the first time on habeas review. *See Dixon v. Varga*, 2019 WL188042 *9-10 (N.D. Ill. Jan. 14, 2019) (ordering supplemental briefing for the petitioner to discuss the new evidence that "would be produced at an evidentiary hearing that would entitle petitioner to relief on his prosecutorial misconduct claim."); *see also Holmes v. Hardy*, 608 F.3d 963, 967-968 (7th Cir. 2010) (discussing the merits of the petitioner's argument that evidence of prosecutorial misconduct was not available to him until his third successive habeas petition).

In this case, no level of due diligence would have allowed Mr. Lewellen to submit the new evidence that is now before this Court. This is because the evidence was not available at trial. For example, Fares Umar's deposition in *Ruiz v. City of Chicago & Lewellen*, No. 11-cv-01420 (N.D. Ill. 2011) did not occur until 15 months after Mr. Lewellen submitted his appellate briefs. ECF No. 3, Exhibit 18. Similarly, the depositions of Lisette and David Venegas in *Ruiz* case did not take place until after Mr. Lewellen's trial. But even aside from that evidence, under the Seventh Circuit's explanation of "new evidence" in *Jones v. Calloway*, all of the exhibits in support of Mr. Lewellen's prosecutorial misconduct argument, which Mr. Lewellen has submitted with this Habeas Motion, are new evidence because none of them were in the record and available for use on direct appeal.

Because Mr. Lewellen has presented new evidence in this Habeas Motion, he has good cause for not raising the prosecutorial misconduct issue on appeal. The prejudice is that the prosecutorial misconduct "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). The prosecutorial misconduct in this case was fundamentally unfair, and thus denied Mr. Lewellen due process. The prosecution presented evidence that they knew was false, and they also improperly vouched for the credibility of their primary witness against Mr. Lewellen. This kind of fundamental unfairness "compels review regardless of procedural defaults." *Murray*, 477 U.S at 494. Accordingly, this Court should vacate Mr. Lewellen's conviction and sentence.

## III.    CONCLUSION

WHEREFORE, Defendant-Petitioner Glenn Lewellen, respectfully requests that this Honorable Court vacate his conviction and sentence. Mr. Lewellen also requests an evidentiary hearing to address the issues raised in his Habeas Motion. Finally, Mr. Lewellen moves for any additional relief that he might be entitled to by law, or that this Court deems just.

Respectfully submitted,

GLENN LEWELLEN

By his attorneys,

*/s/ Adam M. Altman*

*/s/Joseph R. Lopez*

Adam M. Altman                      Joseph R. Lopez
Adam M. Altman, Ltd.                Lopez & Lopez, Ltd.
Attorney No. 6310938                Attorney No. 6186562
1000 S. Clark St., #1707            53 W. Jackson Blvd., Suite 1651
Chicago, IL 60605                   Chicago, IL 60601
(773) 426-6373                      (312) 922-2001

28

**CERTIFICATE OF SERVICE**

I, Adam M. Altman, hereby certify that on June 2, 2019, I served *Glenn Lewellen's Reply To The Government's Response To His 28 U.S.C. § 2255 Petition*, in accordance with Federal Rule of Criminal Procedure 49, Federal Rule of Civil Procedure 5, Local Rule 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system for ECF filers.

Respectfully submitted,

*/s/Adam M. Altman*